UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MILAN V. PATEL <br><br> Defendant. | Civil Action No. 2:23-CV-0026-RWS <br><br> **COMPLAINT** <br> **ECF Case** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendant Milan V. Patel ("Patel" or "Defendant") and alleges as follows:

## SUMMARY

1. Between at least December 2017 and January 2020 (the "Relevant Period"), Patel participated in a fraudulent scheme to manipulate the market for securities of publicly-traded companies by disseminating false rumors designed to cause the price of the target companies' stock and call options to rise temporarily.

2. Patel received the false rumors by telephone or instant messages from Charles Parrino ("Parrino"), Barton Ross ("Ross") or Anthony Salandra ("Salandra"). Throughout the scheme, each of them either drafted, edited, or reviewed the rumors before one of them sent the rumors to Patel.

3. Upon receiving the rumors, which he knew to be false, Patel told Mark Melnick ("Melnick"), formerly the host of a daily subscription based real-time trading webcast, the names of the companies that were the subject of the rumors and directed Melnick to purchase securities

in those companies. Melnick then pulled up the companies' technical charts on his screen and informed his webcast subscribers that he was hearing "chatter" about those companies.

4. Patel further disseminated the false rumors to his contacts at other real-time financial news services, financial chat rooms, and certain other financial news purveyors via instant messages, intending to profit from the price movements the rumors were designed to cause. Patel's contacts then immediately disseminated the rumors further through their news services and in chat rooms and message boards. As a result, the prices of the companies' securities were artificially inflated for a brief period until they were corrected by the market.

5. During the Relevant Period, Patel executed trades designed to profit from the price manipulation caused by his dissemination of these false rumors at least 119 times, earning at least $1,125,263 in ill-gotten gains.

6. By virtue of the conduct alleged herein, Patel violated, and unless restrained and enjoined will violate again, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

7. The Commission brings this action pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1. The Commission seeks a judgment: (1) permanently enjoining Patel from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; and (2) ordering Patel to pay disgorgement of $1,125,263, plus prejudgment interest, and civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3), (5), and (7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), (5), and (7). The Commission also seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to Section 20 and 22 of the Securities Act, 15 U.S.C. §§ 77t and 77v, and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), 78u-l, and 78aa.

9. Venue lies in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the acts, practices, transactions, and courses of business constituting the violations occurred within the Northern District of Georgia, and during the time of the events described herein, the Defendant resided and transacted business in this District.

10. While residing in this District, the Defendant sent and received messages containing false rumors to the other scheme participants and executed trades designed to profit from the price manipulation caused by the scheme.

**DEFENDANT**

11. Patel, age 47, currently resides in Cumming, Georgia. During the Relevant Period, Patel was a self-employed day trader.

**FACTS**

I. **Patel and the Other Scheme Participants Create and Disseminate False Rumors.**

12. During the Relevant Period, Patel was an active day trader, typically buying and selling securities within the same day in order to profit from short-term movements in the securities' prices.

13. Patel first met Salandra in the 1990s when he contacted Salandra to subscribe to a daily stock newsletter that Salandra and two others produced at the time. Patel and Salandra did not keep in touch after Salandra ended his involvement with the newsletter in the late 1990s. Sometime in either 2015 or 2016, after Salandra had reached out to Patel in an effort to reconnect

3

with his previous industry contacts, Patel invited Salandra to come to Atlanta and discuss trading ideas over dinner.

14.     Following that dinner, Patel and Salandra began sharing, over instant messages, various trading ideas and stock rumors each was seeing on different financial message boards. Salandra subsequently introduced Patel to Parrino sometime in 2016 and to Ross sometime in 2017, both of whom had worked with Salandra previously at several securities trading firms.

15.     Patel discussed trading ideas with Salandra, Parrino and Ross via phone calls, instant messenger, and encrypted communications. When Patel learned of rumors about publicly traded companies, he would share them with his network of contacts, which came to include Salandra, Parrino, and Ross. Patel would typically purchase securities in the subject companies before sending the rumors and would quickly sell the securities after forwarding the rumors.

16.     Patel complained to Salandra and Parrino that the rumors they were providing him were not any good because he was receiving them too late. Patel told both Salandra and Parrino that the earlier he received a rumor, the higher the likelihood he could engage in profitable trading around the rumor and the larger the profits he could make.

17.     Beginning sometime in 2016, Parrino and Salandra decided to start creating false rumors about publicly traded companies to send to Patel. Parrino and Salandra utilized their knowledge of the markets to craft believable rumors that would likely cause a desired price increase in the subject companies' stock prices.

18.     By making up the rumors that they sent to Patel, Parrino and Salandra ensured that Patel would get the rumors first, which increased the likelihood that he would disseminate them to his network of financial industry contacts. This enabled Patel, as well as Parrino and Salandra, to earn higher profits because they could purchase the companies' securities before the securities started increasing in price due to the false rumor.

19. In 2017, after being introduced to Patel, Ross joined the scheme and began to work with Parrino and Salandra to create false rumors and send them to Patel.

20. By no later than December 2017, Patel knew that the rumors Parrino, Salandra and Ross were sending to him were false. Patel told them that what types of rumors he preferred; what companies he considered to be good subjects of rumors; what industries he disliked; and what times he preferred to disseminate the rumors.

21. As a result of these conversations with Patel, Salandra, Parrino and Ross focused on only creating and sending to Patel rumors: (i) between 9:30 am and noon and rarely on Fridays; (ii) that were designed to cause companies' securities prices to rise, rather than fall; and (iii) that were about companies that had publicly-traded short-term call options, as the prices of such options were particularly sensitive to rumors. Practically all of the rumors Salandra, Parrino and Ross created and sent to Patel were about corporate mergers or acquisitions, large investments by hedge funds or private equity firms, or other corporate events that would cause the subject company's stock and options prices to increase.

22. After Parrino, Ross, and Salandra reviewed and edited the rumors, Ross or Parrino typically would call Patel to discuss the rumor before sending it to him via instant message. Ross or Parrino would then share with the others Patel's reaction to the rumor.

23. Because Patel knew the rumors were false and were not circulating in the market, Patel could decide when would be the best time to disseminate the rumors in order to maximize his profit potential. Patel often consulted with Melnick to discuss the technical analysis of the securities of the companies that were the subject of the rumor. Melnick would review the price and volume charts of the companies' securities and advise Patel about the short-term trading signals he saw. Patel used that information to decide the optimum time to disseminate the rumors to his contacts.

24. Patel advised Melnick to purchase securities in the companies that were the subjects of the rumors and to disclose the names of the companies with the subscribers to his real-time trading broadcast. Melnick did this by sharing the price and volume charts for those companies in his broadcast and informing his subscribers that he was hearing chatter about those companies.

25. Despite knowing the rumors were false, Patel transmitted them via instant messenger to his numerous contacts at real-time financial news services, subscription-based financial chat rooms, and other financial news purveyors with sizable followings. Within minutes, if not seconds, the false rumors began appearing as "chatter" – i.e., the subject of discussion – on several of the financial news services and in the chat rooms and message boards at which his contacts worked or participated.

26. Patel and the other scheme participants repeated the process of creating and disseminating false rumors numerous times over the Relevant Period.

## II. Patel Trades Profitably around the False Rumors.

27. Before he disseminated the false rumors, Patel purchased securities of the publicly-traded companies that were the subject of the false rumors.

28. Patel purchased short-term call options in the subject companies that expired within a day or two. He typically purchased the options minutes before disseminating the rumors.

29. The spread of the false rumors through various news services and in financial chat rooms, as well as Patel's and the other scheme participants' own purchases, caused an uptick in trading volume and typically resulted in an increase in the subject companies' securities prices. Though the percentage increase in the companies' stock prices often was relatively modest,

typically less than 2%, the percentage increase in the price of the companies' short-term call options was frequently significant, often exceeding 25%.

30. Patel almost always began selling his positions within minutes, if not seconds, after her pushed the false rumors out to his industry contacts.

31. Patel traded at least 119 times around the false rumors, earning at least $1,125,263 in ill-gotten gains during the Relevant Period. An Appendix identifying the date and ticker symbol of the 119 instances, as well as the amount of ill-gotten gains Patel earned from his trading in each instance, is attached hereto. Melnick similarly traded around many of the false rumors and paid kickbacks to Patel in return for providing him with notice of the false rumors before Patel disseminated the rumors. Over the period of the scheme, Melnick made payments to Patel totaling approximately $190,000, a material portion of which amounted to kickbacks based on Melnick's profits from the false rumors.

### III. Examples of Patel's Participation in the Market Manipulation Fraud

#### A. February 2018 Pacific Gas & Electric, Inc. ("PCG") Rumor

32. On February 1, 2018 at 10:25:02 am, Parrino sent to Salandra and Ross the following draft rumor falsely stating that Pacific Gas & Electric, ticker symbol PCG, had been absolved of potential liability for a catastrophic fire that had occurred in California in late 2017:

> A spokeswoman for the California Department of Forestry and Fire Protection is stating that after thorough investigation it has determined that the fires that decimated a Santa Rosa neighborhood and killed 21 people was caused by electrical equipment owned, installed, and maintained by a third party exonerating Pacific Gas and electric Co. (PCG) from all liability.

33. Ross advised that, as there was a large seller of PCG securities presently in the market that could potentially blunt the manipulative impact of their rumor, they should wait a bit before sending it to Patel. Ross told the others that he would let them know when to proceed. Over an hour later, at 11:37:09 am, Ross advised Parrino and Salandra that they should send the

rumor to Patel.    Thirty seconds later, Parrino messaged Patel to "pik [sic] up," and, after they spoke, Parrino sent the rumor to Patel at 11:40:57 am.

34.     Mere seconds after receiving the rumor – specifically, between 11:41:16 am and 11:41:59 am – Patel purchased a total of 382 PCG call options (182 options with an exercise price of $42.50, and 200 options with an exercise price of $43.00), all with an expiration date of the following day, February 2, 2018, for a total cost of $5,640.

35.     During the minute of Patel's purchases, PCG stock traded between $42.27 and $42.32, less than the exercise prices of the options he had purchased.

36.     At 11:48:58 am, nearly eight minutes after he received the rumor, Patel slightly revised and disseminated the rumor via instant messenger to his financial headline news services and chatroom contacts:

> PCG Hearing chatter the California Department of Forestry and Fire Protection is stating that after a thorough investigation it has determined that the fires that decimated a Santa Rosa neighborhood and killed 21 people was caused by electrical equipment owned, installed, and maintained by a third party exonerating Pacific Gas & Electric (PCG) from all liability.  Unconfirmed

37.     The false rumor was immediately repeated by the financial websites and chat rooms and promptly caused an increase in the trading volume and price of PCG's stock and options.  Between 11:48 am and 11:53 am, PCG stock increased in price from $42.29 to $45.46, and the volume of shares traded increased from just over 10,000 shares in the minute preceding Patel's disseminating the rumor to over 400,000 shares in the minute following.

38.     The price increase was so significant that trading in PCG securities was temporarily halted at 11:53 am and spokespersons for PCG and the California Department of Forestry and Fire Protection each subsequently issued respective statements that the rumor was false.

39. The following charts illustrate the increase in price and trading volume of PCG stock and the PCG call options purchased by Patel, before and after he disseminated the rumor at 11:48:58 am.

**Volume and Price of PCG Stock Increase**



**Volume and Price of PCG Call Options Increase**



9



40.     Patel sold all of his PCG call options between 11:49:36 am and 11:49:54 am, less than one minute after pushing the false rumor, resulting in unlawful profits of $12,420.

B.    **July 2018 Yelp, Inc. Rumor**

41.     On the morning of July 25, 2018, Parrino sent an instant message to Ross instructing him to work on a rumor for Yelp, Inc. ("YELP").  Ross suggested "maybe IAC [Interactive Corp.] could buy yelp," noting that IAC had bought Angie's List, and at 9:28:58 am, Ross sent Parrino the following draft rumor:  "Hearing that Iac/Interactive Corp has made an offer to acquire Yelp Inc. (YELP) for $50 a share."

42.     Parrino told Ross he liked the draft rumor and suggested they watch Yelp's stock price for a bit.  At the time, Yelp stock was trading at approximately $38 per share.  Parrino, Ross, and Salandra continued to discuss the timing for sending out the Yelp rumor, but ultimately decided to hold off sending the rumor to Patel because there was a large seller of YELP shares in the market that could potentially impact the manipulative impact of their rumor.

43.     The next morning, July 26, 2018, at 8:55:31 am, Ross resent Parrino and Salandra the Yelp rumor, to which Salandra responded "yelp looks good."  At 10:41:23 am, Ross

10

messaged Patel asking if he was available for a call. When Patel asked "what's up," Ross responded "yelp" and then called Patel to tell him the Yelp rumor they had drafted. While speaking with Ross, Patel purchased 300 YELP calls for a total cost of $13,500.

44. Ross reported back to Parrino and Salandra that Patel "likes it." When Ross failed to send the rumor to Patel immediately, Patel messaged "???" and "ur gonan fek shit up" *[sic]*. At 10:49:14 am, Ross messaged the Yelp rumor to Patel and quickly informed Parrino and Salandra that "he is doing it."

45. Despite knowing it was false, Patel disseminated the rumor "YELP Hearing that Iac/Interactive Corp has made an offer to acquire Yelp Inc. (YELP) for $50 a share, unconfirmed" to his financial headline news services and chatroom contacts at 10:49:53 am.

46. Within one minute of Patel's sending the Yelp rumor to his contacts, several financial new websites and chat rooms repeated the false rumor, which promptly caused an increase in the trading volume and price of Yelp's stock and options. Between 10:48 am and 11:01 am, YELP stock increased in price from $39.12 to $40.23 while the price of the YELP calls Patel purchased increased in price from $0.52 to $1.40. The volume of YELP shares traded increased from 2,000 shares in the minute preceding Patel's disseminating the rumor to nearly 100,000 shares in the minute following.

47. The following charts illustrate the increase in the price and trading volume of YELP stock and the YELP call options purchased by Patel, before and after he disseminated the rumor at 10:49:53 am.

11

**Volume and Price of Yelp Stock Increase**



**Volume and Price of Yelp Call Options Increase**



48. Between 10:50:07 am and 11:00:50 am, Patel sold the 300 Yelp options he had purchased, resulting in unlawful profits of $10,181.

## FIRST CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

49. The Commission realleges and incorporates by reference Paragraphs 1 through 48, as though fully set forth herein.

50. By virtue of the foregoing, Patel, directly or indirectly, singly or in concert with others, in the offer or sale of any security, with scienter, used the means or instruments of transportation or communication in interstate commerce or of the mails to: (a) employ any device, scheme, or artifice to defraud; (b) obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in any transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

51. By virtue of the foregoing, Patel, directly or indirectly, violated and, unless restrained and enjoined, will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder

52. The Commission realleges and incorporates by reference Paragraphs 1 through 48, as though fully set forth herein.

53. By virtue of the foregoing, Patel, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to: (1) employ devices, schemes, or artifices to defraud; (2) make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

54.    By virtue of the foregoing, Patel, directly or indirectly, violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder,17 C.F.R. § 240.10b-5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Judgment:

### I.

Finding that Patel violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Patel and his agents, servants, employees, and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

### III.

Ordering Patel to pay disgorgement of $1,125,263, along with prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act, 15 U.S.C. § 78u(d)(7);

### IV.

Ordering Patel to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), in an amount to be determined by the Court; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.

Dated: Atlanta, Georgia
February 16, 2023

    /s/ Damon W. Taaffe
Damon W. Taaffe
Trial Counsel
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Desk: (202) 551-7420
taaffed@sec.gov

# APPENDIX

## PATEL'S PROFITS FROM TRADING
## AROUND THE DISSEMINATION OF FALSE RUMORS

|    | Rumor/Trade Date | Ticker Symbol | Patel's Trading Profits |
|----|------------------|---------------|-------------------------|
| 1  | 12/13/2017 | XLNX | $3,377 |
| 2  | 12/20/2017 | CBS  | $11,761 |
| 3  | 12/21/2017 | ETFC | $6,800 |
| 4  | 1/3/2018   | HUM  | $15,375 |
| 5  | 1/8/2018   | BBBY | $960 |
| 6  | 1/9/2018   | CI   | $5,490 |
| 7  | 1/12/2018  | YELP | $9,075 |
| 8  | 1/18/2018  | EA   | $1,933 |
| 9  | 1/18/2018  | IP   | $8,214 |
| 10 | 1/19/2018  | ULTA | $4,103 |
| 11 | 1/22/2018  | AMD  | $3,675 |
| 12 | 1/23/2018  | PEP  | $2,580 |
| 13 | 1/25/2018  | JD   | $1,574 |
| 14 | 1/29/2018  | MOS  | $3,281 |
| 15 | 2/1/2018   | PCG  | $12,420 |
| 16 | 2/13/2018  | UPS  | $24,735 |
| 17 | 2/14/2018  | TIF  | $23,568 |
| 18 | 2/15/2018  | TMUS | $10,206 |
| 19 | 2/16/2018  | WYNN | $53,318 |
| 20 | 2/20/2018  | CREE | $20,591 |
| 21 | 2/22/2018  | LLY  | $4,837 |
| 22 | 3/1/2018   | TXT  | $18,453 |
| 23 | 3/6/2018   | ON   | $2,188 |
| 24 | 3/7/2018   | HFC  | $6,609 |
| 25 | 3/8/2018   | DIS  | $33,998 |
| 26 | 3/15/2018  | AMAT | $5,051 |
| 27 | 3/15/2018  | GLW  | $1,860 |
| 28 | 3/23/2018  | HES  | |
| 29 | 3/26/2018  | TAP  | $2,934 |
| 30 | 4/5/2018   | SYF  | $10,800 |
| 31 | 4/10/2018  | WMB  | $5,522 |
| 32 | 4/11/2018  | LNG  | $2,668 |
| 33 | 4/12/2018  | HOG  | $13,927 |
| 34 | 4/12/2018  | LUV  | $3,150 |
| 35 | 4/13/2018  | HAS  | $1,579 |
| 36 | 4/17/2018  | EAT  | $13,645 |
| 37 | 4/18/2018  | BEN  | $6,300 |
| 38 | 4/18/2018  | FDX  | $2,788 |

| | | | |
|---|---|---|---|
| 39 | 4/19/2018 | EA | $14,727 |
| 40 | 4/20/2018 | WDC | $3,250 |
| 41 | 4/20/2018 | W | $3,988 |
| 42 | 4/24/2018 | EOG | $1,645 |
| 43 | 4/24/2018 | DISH | |
| 44 | 4/25/2018 | DKS | $50 |
| 45 | 5/1/2018 | AZN | $7,260 |
| 46 | 5/2/2018 | CHKP | $1,050 |
| 47 | 5/4/2018 | ALXN | |
| 48 | 5/15/2018 | FSLR | $4,872 |
| 49 | 5/16/2018 | SFM | $6,325 |
| 50 | 5/17/2018 | STX | $897 |
| 51 | 5/24/2018 | IP | $12,078 |
| 52 | 5/24/2018 | AKAM | $33 |
| 53 | 5/30/2018 | CL | $1,936 |
| 54 | 5/31/2018 | AAL | $13,670 |
| 55 | 6/5/2018 | ETN | $11,977 |
| 56 | 6/20/2018 | SFIX | $24,910 |
| 57 | 6/20/2018 | REGN | $6,100 |
| 58 | 6/21/2018 | WYNN | $1,461 |
| 59 | 7/11/2018 | MO | $8,592 |
| 60 | 7/12/2018 | NKE | $10,362 |
| 61 | 7/20/2018 | CELG | $8,111 |
| 62 | 7/25/2018 | RHT | $5,558 |
| 63 | 7/26/2018 | PFE | |
| 64 | 7/26/2018 | YELP | $10,181 |
| 65 | 7/31/2018 | CAH | $5,998 |
| 66 | 8/3/2018 | IBM | $1,200 |
| 67 | 8/3/2018 | OSTK | $6,610 |
| 68 | 8/8/2018 | WYNN | $34,768 |
| 69 | 8/9/2018 | GM | |
| 70 | 8/15/2018 | IBM | $5,967 |
| 71 | 8/22/2018 | EA | $5,930 |
| 72 | 8/22/2018 | DE | $834 |
| 73 | 9/5/2018 | LNC | $21,917 |
| 74 | 9/21/2018 | AGN | $5,523 |
| 75 | 9/26/2018 | IP | $9,275 |
| 76 | 9/27/2018 | WDC | $151 |
| 77 | 11/9/2018 | KBH | $12,544 |
| 78 | 11/16/2018 | V | $6,086 |
| 79 | 11/27/2018 | ETFC | |
| 80 | 12/20/2018 | ATVI | $12,291 |
| 81 | 1/15/2019 | SFIX | $15,143 |
| 82 | 1/17/2019 | SKX | $8,900 |

| | | | |
|---|---|---|---:|
| 83 | 2/6/2019 | KMB | $20,524 |
| 84 | 2/28/2019 | SYF | |
| 85 | 3/13/2019 | HBI | $2,915 |
| 86 | 3/28/2019 | DAL | $8,474 |
| 87 | 4/10/2019 | URBN | $4,845 |
| 88 | 5/16/2019 | FDX | $19,177 |
| 89 | 6/11/2019 | BB | $32,168 |
| 90 | 8/1/2019 | XLNX | $7,626 |
| 91 | 8/15/2019 | K | $24,196 |
| 92 | 8/27/2019 | YELP | $11,213 |
| 93 | 9/5/2019 | KSS | $17,815 |
| 94 | 9/11/2019 | SPLK | $18,730 |
| 95 | 9/19/2019 | SWKS | $202 |
| 96 | 9/20/2019 | TPR | $2,020 |
| 97 | 9/26/2019 | WYNN | $10,248 |
| 98 | 10/3/2019 | ROKU | $25,774 |
| 99 | 10/10/2019 | GILD | $23,201 |
| 100 | 10/16/2019 | IP | $8,962 |
| 101 | 10/17/2019 | ULTA | $22,891 |
| 102 | 10/24/2019 | ATVI | $7,997 |
| 103 | 10/25/2019 | UPS | $34,131 |
| 104 | 10/30/2019 | BUD | $994 |
| 105 | 11/5/2019 | CL | $5,276 |
| 106 | 11/6/2019 | YUM | $11,066 |
| 107 | 11/8/2019 | AAL | $7,424 |
| 108 | 11/12/2019 | TWLO | $8,637 |
| 109 | 11/21/2019 | AXP | $14,614 |
| 110 | 12/9/2019 | HLF | $3,883 |
| 111 | 12/10/2019 | IBM | $3,932 |
| 112 | 12/10/2019 | HOG | $9,259 |
| 113 | 12/18/2019 | CREE | $8,388 |
| 114 | 12/19/2019 | NTAP | |
| 115 | 1/8/2020 | FDX | $6,263 |
| 116 | 1/9/2020 | PINS | $10,503 |
| 117 | 1/10/2020 | WYNN | $24,842 |
| 118 | 1/14/2020 | COF | $27,208 |
| 119 | 1/14/2020 | UBER | $8,350 |
| | | | |
| | Total | | $1,125,263 |